# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 13, 2004        Decided January 14, 2005

No. 02-1244

Beethoven.Com LLC., et al.,
Petitioners

v.

Librarian of Congress,
Respondent

American Federation of Television and Radio Artists, et al.,
Intervenors

---

Consolidated with
02-1246, 02-1247, 02-1248, 02-1249

---

On Petitions for Review of an Order of the
United States Department of Justice

---

*Bruce G. Joseph* argued the cause for Participant Licensee petitioners. With him on the briefs were *Karyn K. Ablin*, *Dineen P. Wasylik*, and *Elizabeth H. Rader*.

*Elizabeth H. Rader* and *David Kushner* argued the cause for Non-Participant petitioners/intervenors. With them on the briefs was *Mark J. Prak*.

*Michele J. Woods* argued the cause for Copyright Owners/Performers petitioners. With her on the briefs were *Ronald A. Schechter*, *Patricia Polach*, *Arthur Levine*, and *Laura P. Masurovsky. Cary H. Sherman* and *Robert A. Garrett* entered appearances.

*Mark W. Pennak*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, and *William Kanter*, Deputy Director.

Before: SENTELLE, HENDERSON and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Three groups of Petitioners seek review of a final rule issued by Respondent Librarian of Congress ("Librarian"), setting copyright license rates for webcasters. *See* Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings, 67 Fed. Reg. 45,240 (July 8, 2002) ("Final Rule"). The Librarian's decision was based on proceedings before a Copyright Arbitration Royalty Panel ("CARP"). One group of Non-Participant Petitioners-Intervenors ("Non-Participants") did not participate formally in the CARP proceedings, but challenges the rates set by the Librarian based on the CARP's recommendations. The Non-Participants also argue that the CARP process itself was flawed because it excluded small webcasters and those who could not afford arbitration fees, violating their rights to due process and freedom of expression. The Non-Participants include Beethoven.com and three other entities who seek to join or intervene in this case, as well as one, Education Information Corporation ("EIC") that only seeks to intervene. A second group of Petitioners–Copyright Owners and

performers that include the Recording Industry Association of America ("RIAA") and other industry groups (jointly, "Owners")–argue that the Librarian set rates arbitrarily low by not adequately considering past agreements he had on the record. The third group of Participant Licensee Petitioners includes (1) radio broadcasters who simulcast via radio and internet ("Simulcasters") and (2) internet webcasters who broadcast solely over the internet ("Webcasters") (jointly, "Broadcasters"). These Broadcasters, who were parties to the CARP proceedings, claim that the Librarian's rates were arbitrary, contending that rates should be lowered because they were not based on real market factors. Respondent Librarian attacks the standing of the Non-Participants, while defending his rate determinations. Because we hold that the Non-Participants have no standing and seek to intervene only to impermissibly raise new issues, we deny their petition for review and do not permit intervention. As to the issues properly before us, raised by the Owners and Broadcasters, we find no reversible error and therefore deny their petitions for review. The Owners' challenge to the payment date set by the Librarian is moot.

## I. Background

*A. Statutory Background*

Since the enactment of the Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39 (amending 17 U.S.C. §§ 106 & 114), copyright owners have had exclusive rights in performances of their works by digital audio transmission. The Digital Millennium Copyright Act of 1998 ("DMCA"), Pub. L. No. 105-304 (amending scattered sections of 17 U.S.C.), expanded copyright protection to non-subscription "webcasting" and created a statutory license in performances by webcast. 17 U.S.C. § 114(f)(2). The DMCA creates a six-month negotiation period for copyright owners and

statutory licensees to privately determine rates and fees for these licenses. *Id.* § 114(f)(2)(A). If no agreement is reached at that time, the Librarian convenes a CARP to set rates and terms "that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* § 114(f)(2)(B). The CARP decision is to be based on "economic, competitive and programming information presented by the parties," including

> (i) whether use of the service may substitute for or may promote the sales of phonorecords or otherwise may interfere with or may enhance the sound recording copyright owner's other streams of revenue from its sound recordings; and

> (ii) the relative roles of the copyright owner and the transmitting entity in the copyrighted work and the service made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, and risk.

*Id.* The same standards are to be used to determine the statutory license rate for "ephemeral recordings," the temporary copies necessary to facilitate the transmission of sound recordings during internet broadcasting. *Id.* § 112(e).

Any person entitled to a statutory license may become a party to the CARP rate-setting proceedings by submitting "relevant information and proposals" to the CARP. 17 U.S.C. § 802(c). Parties are entitled to discovery, presentation of evidence and witnesses, and a formal trial-type hearing before an arbitrator. 37 C.F.R. §§ 251.41, 251.43, 251.45. The CARP then acts on the basis of the written record and precedent from the Copyright Royalty Tribunal, other CARP decisions, and the Librarian. Costs of the arbitration are imposed on the parties to

the CARP proceeding, with the CARP determining the allocation of costs among the parties. 17 U.S.C. § 802(c).

Within 90 days after receiving the CARP report, the Librarian must either adopt or reject its determination, adopting it unless the rates and terms are "arbitrary or contrary to the applicable provisions" of the statute. 17 U.S.C. § 802(f). If the Librarian rejects the report he may set a fee based on the record before the CARP. *Id.* "[A]ny aggrieved party who would be bound by the determination" may challenge the Librarian's decision before this Court. *Id.* § 802(g). This Court then has jurisdiction to "modify or vacate a decision of the Librarian only if it finds, on the basis of the record before the Librarian, that the Librarian acted in an arbitrary manner." *Id.*

*B. The CARP and the Librarian's Decision*

The CARP proceeding at issue here was instituted to set rates and terms for statutory licenses during the period between October 28, 1998 and December 31, 2002, after the period for voluntary negotiation had expired. None of the Non-Participants took steps to join the CARP proceedings by filing Notices of Intent to Participate. One Non-Participant, EIC, wrote a letter to the CARP asking permission to present an *amicus*-type pleading because it had only limited interest in the results and could not afford to participate in the full proceedings. This request was denied. The Owners and Broadcasters did take part in the CARP arbitration. The CARP completed its proceedings on February 1, 2002 and presented its report to the Librarian on February 20, 2002. *See* Rate Setting for Digital Performance Right in Sound Recordings and Ephemeral Recordings, Docket No. 2000-9, *available at* http://www.copyright.gov/carp/webcasting_rates.pdf ("CARP Report").

During the private negotiation period prior to the CARP arbitration, the RIAA formed a committee of five major record labels to develop and carry out a common strategy for engaging in collective negotiations with prospective licensees. This committee ultimately negotiated 26 agreements which RIAA submitted to the CARP as evidence of market valuation of the licenses. The CARP determined that the RIAA strategy was targeted at supra-competitive licensing fees to conform with its view of the "sweet spot" for the royalty rates. CARP Report at 48. RIAA then would only close deals that hit its "sweet spot" to create a favorable record before the CARP, generally with businesses driven by factors other than the value of the sound performance rights. *Id.* The CARP found that the rates in 25 of these agreements were higher than the majority of buyers was willing to pay and thus did not establish a reliable benchmark. *Id.* at 51. Nonetheless, it did accord them some weight by using them to justify rounding ephemeral recording rates from 8.8 percent of performance fees up to 9 percent. *Id.* at 104. To corroborate the rates in the 26 benchmark agreements, RIAA also submitted 115 record label licensing agreements between individual record companies and licensees. The CARP disregarded all of these agreements because they did not involve the same digital performance rights at issue in the proceeding. *Id.* at 71.

The one RIAA benchmark given "great weight" by the CARP was an agreement between RIAA and Yahoo!, Inc. ("Yahoo!"), a company recognized to be a "major player" in making sound recording transmissions (the "RIAA-Yahoo! agreement"). CARP Report at 60-61. This weight was not without qualifications, however. The CARP found that due to Yahoo!'s dominant role in the industry it stood to bear a substantial portion of any arbitration costs and thus was willing to accept an inflated royalty rate to avoid these costs. *Id.* at 68. Yahoo! also testified that it anticipated significant savings in

arbitration fees and opportunity costs by making an agreement with RIAA. *Id.* Even so, the rates negotiated by Yahoo! were considerably lower than those of the 25 other agreements offered by RIAA as benchmarks. *Id.* at 60. The terms of the RIAA-Yahoo! agreement provided that Yahoo! pay $1.25 million for the first 1.5 billion performances and after that 0.05¢ per radio retransmission performance and 0.2¢ per internet-only performance. Final Rule, 67 Fed. Reg. at 45,251.

The Broadcasters also submitted a proposed benchmark for determining the fair market value of the performance right based on a computation of the performance fees paid by over 800 radio stations for rights to musical works. Using this analysis, their expert concluded that 0.008¢ per radio retransmission and 0.014¢ per internet-only performance was appropriate. The CARP determined that actual marketplace agreements for webcasting were a better benchmark than a theoretical model. CARP Report at 43. Thus it relied entirely on the RIAA-Yahoo! agreement to set its rates and terms, while acknowledging that this agreement was inflated. *Id.* at 67-69.

The CARP determination was challenged by several parties. The Librarian rejected it in part on May 21, 2002. *See* Final Rule, 67 Fed. Reg. at 45,243, citing Order, Docket No. 2000-9 CARP DTRA 1&2 (May 21, 2002). The Librarian agreed with the CARP that the benchmark and record label agreements were generally unreliable, but found that the CARP's minimal reliance on the 26 benchmark agreements to round ephemeral rates up was arbitrary. Final Rule, 67 Fed. Reg. at 45,262. Because he did not consider benchmarks from the 25 non-Yahoo! agreements, he lowered ephemeral royalty rates from the CARP's recommendation of 9 percent of the royalty fees paid to 8.8 percent. *Id.* The Librarian based his decision solely on the RIAA-Yahoo! agreement, refusing to reduce its value to account for any litigation cost savings Yahoo! might have

realized by avoiding the CARP process. *Id.* at 45,255. The Librarian abandoned the dual-rate structure adopted by CARP to differentiate between radio retransmission and internet-only webcasting, adopting instead a rounded-down average of the two rates, 0.07¢ per performance. *Id.* at 45,255. The Librarian did accept the $500 minimum fee recommended by the CARP–the lowest such fee in all the benchmark submissions–reasoning that RIAA would not have agreed to it if it was not at least sufficient to meet costs. *Id.* at 45,263. Finally, although no parties had requested the change, the Librarian altered the terms of the CARP agreement to move the due date for royalty payments back two months to October 20, 2002. *Id.* at 45,271.

The Broadcasters, Owners, and Non-Participants petitioned this Court for review of the Librarian's decision. Non-Participants also sought in the alternative to intervene in the case. These issues have been consolidated for review.

## II. Analysis

*A. Status of the Non-Participants*

1. Standing

As a preliminary question we must consider whether Non-Participants have standing before this Court. The Supreme Court has repeatedly observed that "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 373, 377 (1994) (citations omitted). The statutory grant of jurisdiction under which we review this order of the Librarian provides for appeals "by any aggrieved party who would be bound by the determination." 17 U.S.C. § 802(g). Non-Participants claim that they should be allowed to petition

for review because they are aggrieved by the order, and the word "party" should encompass them and all other entities both aggrieved and "bound by the determination." The Librarian counters that "party" refers to a party to the CARP proceeding below.

The language of § 802(g) has not been interpreted by any federal court of appeals. This Court has, however, considered similar language in other contexts. We have consistently interpreted the Hobbs Act's grant of jurisdiction to "any party aggrieved" to be limited to parties to the agency proceedings giving rise to the order. *See Simmons v. ICC*, 716 F.2d 40, 42 (D.C. Cir. 1983) (interpreting 28 U.S.C. § 2344). We have held that identical language in the Bank Holding Company Act similarly limits jurisdiction to parties to the agency proceedings. *Jones v. Board of Governors*, 79 F.3d 1168, 1171 (D.C. Cir. 1996) (interpreting 12 U.S.C. § 1848). We note that the D.C. District Court has also held that the plain meaning of this language in the context of the Federal Election Campaign Act limits it to parties to the administrative complaint. *Judicial Watch, Inc. v. FEC*, 293 F. Supp. 2d 41 (D.D.C. 2003) (interpreting 2 U.S.C. § 437g(a)(8)(A)). It is thus consistent with precedent to similarly construe 17 U.S.C. § 802(g).

The plain language also mandates such a construction. Because Congress chose to grant review to "parties," we have no reason to believe it meant "persons" or anything else other than parties to the proceeding. When it means to grant broader review, it says so, as in the Administrative Procedure Act, which accords judicial review to any "*person . . .* aggrieved." 5 U.S.C. § 702 (emphasis added); *see Simmons*, 716 F.2d at 43. We can find no instance where Congress has used "party" to simply mean "person."

Furthermore, the Congress that first enacted this language in 1976 as 17 U.S.C. § 810 knew of our interpretation of "party aggrieved." *See, e.g.*, *Gage v. U.S. Atomic Energy Comm'n*, 479 F.2d 1214, 1219 (D.C. Cir. 1973) (interpreting the Hobbs Act); *Easton Utilities Comm'n v. Atomic Energy Comm'n*, 424 F.2d 847, 853 (D.C. Cir. 1970) (referring to interpretation of Hobbs Act); *Outward Continental North Pac. Freight Conference v. Federal Maritime Comm'n*, 385 F.2d 981, 982 n.3 (D.C. Cir. 1967) (Hobbs Act); *see also First Nat. Bank of St. Charles v. Board of Governors of Federal Reserve System*, 509 F.2d 1004, 1008 (8th Cir. 1975) (Bank Holding Company Act). Assuming as "is always appropriate . . . that our elected representatives, like other citizens, know the law," we take Congress' use of "any aggrieved party" to mean that judicial review is limited to parties to the proceeding below, as similar language has consistently been interpreted. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-99 (1979).

### 2. Intervention

Although Non-Participants do not have standing before this Court as petitioners, they have, in the alternative, requested leave to intervene. However, "[a]n intervening party may join issue only on a matter that has been brought before the court by another party." *Edison Electric Institute v. EPA*, No. 96-1062, 2004 U.S. App. LEXIS 25474 at *21 (D.C. Cir. Dec. 10, 2004). Non-Participants' brief makes First Amendment and due process claims not addressed by any of the other petitioners properly before this Court. The bare assertion in Non-Participants' reply brief that the other copyright licensee petitioners shared their First Amendment and due process concerns, and that the briefs "intentionally address different arguments to avoid repetitious submissions" is not sufficient to bring Non-Participants' claims into the purview of this action. Non-Particip. Reply Br. at 4; *see Edison Electric*, 2004 U.S. App. LEXIS 25474 at *21. We will

not permit intervention for the purpose of raising these new issues.

*B. Review of the Librarian's Decision*

We turn to the issues raised by parties properly before us. This Court has "jurisdiction to modify or vacate a decision of the Librarian only if it finds, on the basis of the record before the Librarian, that the Librarian acted in an arbitrary manner." 17 U.S.C. § 802(g). This standard is "exceptionally deferential." *Recording Indus. Ass'n of Am. v. Librarian of Congress*, 176 F.3d 528, 532 (D.C. Cir. 1999). We "will uphold a royalty award if the Librarian has offered a facially plausible explanation for it in terms of the record evidence." *National Ass'n of Broadcasters v. Librarian of Congress*, 146 F.3d 907, 918 (D.C. Cir. 1998) ("*NAB*").

Understandably, the Owners challenge the Librarian's ruling as setting rates too low, and the Broadcasters argue that the rates have been set too high. The Owners initially argue that the Librarian failed to adequately consider the 115 label agreements and 26 RIAA benchmark agreements in setting the royalty rates for sound recording performances and ephemeral recordings. They also criticize the Librarian's choices of minimum fee and due date for payments in arrears. Broadcasters argue that the Librarian's reliance on the RIAA-Yahoo! agreement was inappropriate, that he should have adjusted rates further downward because of litigation cost savings in that agreement, and that the rejection of the CARP's different rates for Simulcasters and Webcasters was inappropriate. Under our deferential standard of review, we find no reversible error in the Librarian's decision.

1. Failure to consider the RIAA's proposed alternate benchmarks

The Owners argue that the Librarian acted arbitrarily by rejecting the 115 label agreements without sufficient explanation. In their view, these agreements "provide corroboration for RIAA's benchmark analysis from rates reached in the actual marketplace, unconstrained by the statutory license." Owners' Br. at 23. Accordingly, the Owners maintain that, by failing to consider the label agreements, "the Librarian arbitrarily neglected a tremendous amount of economic and competitive information that would have permitted him to make a far more informed decision on rates for use of copyrighted sound recordings." *Id*. This claim is without merit.

The CARP rejected these label agreements as useful benchmarks for two reasons. It first explained that, unlike the 26 RIAA benchmark agreements, all of which addressed the "precise rights at issue here," the label agreements involved rights not subject to a statutory license. CARP Report at 71. The CARP additionally explained that, were it inclined to rely on these agreements, "the effect would likely be to undermine, not corroborate, RIAA's proposals in that many of the agreements reflect rates below those which RIAA is proposing." *Id.* The Librarian accepted these rationales, *see* Final Rule at 45,248 n.20, and in so doing was not obligated to "fully recapitulat[e]" the CARP's analysis. *NAB*, 146 F.3d at 926; *see* 17 U.S.C. § 802(f). The Owners nevertheless maintain that the Librarian should have looked harder at–and ultimately relied on–these label agreements.

Their challenge cannot succeed under the deferential standard of review applicable here. *NAB*, 146 F.3d at 924. The Owners purport to attack the sufficiency of the Librarian's explanation for eschewing reliance on the label agreements. But

at the bottom, their challenge seeks to undermine the substance of the CARP's and Librarian's determinations regarding the weight to ascribe to these agreements. As the *NAB* court explained, "it is emphatically not [the court's] role to independently weigh the evidence . . . ." 146 F.3d at 930. Even to the extent that the Owners argue that the Librarian set rates in an arbitrary manner by failing to place some greater emphasis on the label agreements, their contentions are unpersuasive.

Under the applicable "exceptionally deferential" standard of review, we conclude that there is nothing "compelling" in the label agreements, or in the CARP's and Librarian's treatment of them, that would allow the court to hold that the Librarian set the rates in an "arbitrary manner." *See NAB*, 146 F.3d at 931. The Librarian's decision to eschew reliance on the label agreements in favor of the RIAA-Yahoo! agreement seems perfectly sensible because the label agreements, unlike the RIAA-Yahoo! agreement, indisputably cover rights not subject to the statutory licenses involved in this proceeding. Furthermore, as the Librarian explained, the RIAA-Yahoo! agreement was "particularly reliable and probative" not only because it was an "actual marketplace agreement[] pertaining to the same rights for comparable services," but also because it involved a successful and sophisticated market participant with resources and bargaining power comparable to RIAA's own. Final Rule, 67 Fed. Reg. at 45,247-48.

At oral argument, the Owners asserted that the Librarian inaccurately described the content of the label agreements in a footnote, and, therefore, his estimation of the value of these agreements was necessarily arbitrary and cannot have been based on an in-depth analysis of the agreements. Final Rule, 67 Fed. Reg. at 45,248 n.20. The details of the Librarian's description are in the sealed record and redacted from the Federal Register to protect trade secrets, but are ultimately not

significant in our determination. The description of the agreements was at worst harmless error, if error at all, as the agreements were never tendered for anything more than corroborative evidence of evidence upon which the Librarian chose not to place great reliance. Even if described properly, the agreements could have been no more than that – essentially a shadow of a shadow.

2. Owners' challenges to the treatment of RIAA's 26 benchmark agreements

The Owners' claims concerning the Librarian's treatment of the 26 RIAA benchmark agreements likewise fail. They maintain that the Librarian acted arbitrarily, and contrary to 17 U.S.C. §§ 112 and 114, by only relying on the RIAA-Yahoo! agreement and not the other 25 RIAA benchmark agreements. More specifically, they assert that the Librarian acted in an arbitrary manner by: (1) ignoring the weight the CARP gave the other 25 benchmark agreements by adopting a unitary rate instead of a dual rate structure; (2) rejecting the CARP's reliance on the ephemeral recording rate contained in eight of the 25 other agreements to set an ephemeral recording rate of 9 percent; and (3) adjusting both the sound recording performance rate and ephemeral recording rate downward through the "application of rounding." Owners' Br. at 26. These claims all fail.

The Owners' contentions, like the ones addressed above, are unpersuasive under the applicable standard of review. See *NAB*, 146 F.3d at 924, 930. In deploying this standard, the court "will set aside a royalty award only if [it] determine[s] that the evidence before the Librarian compels a substantially different award." *Id.* at 918. Despite the Owners' arguments to the contrary, the Librarian has offered a "facially plausible explanation . . . in terms of the record evidence" for the royalty rates under review. *Id.* The Librarian thoroughly explained his

decision to base the sound recording performance rate and ephemeral recording rate on the terms of the RIAA-Yahoo! agreement, as that agreement was "particularly reliable and probative" because it reflected actual marketplace rates. *See* Final Rule, 67 Fed. Reg. at 45,247-49. The Librarian further explained how, based on the terms of the RIAA-Yahoo! agreement, he arrived at a unitary 0.07¢ royalty rate for sound recording performances and a rate of 8.8 percent of performance royalties for ephemeral recordings. *Id.* at 45,251-53, 45,255, 45,261-62. Given the Librarian's reliance on the RIAA-Yahoo! agreement, the 25 other benchmark agreements–which both the CARP and Librarian found to be unreliable–do not resonate as evidence so compelling as to require "a substantially different award." *NAB*, 146 F.3d at 918.

Moreover, each of the Librarian's specific decisions challenged by the Owners is adequately explained and based on record evidence. First, the Librarian thoroughly explained his decisions to select a "unitary" rate for transmissions of sound recordings – which he based on the finding that the RIAA-Yahoo! agreement's differential rate structure did not reflect a true distinction in value between internet-only webcasts and radio retransmissions – and to set the sound performance royalty rate at the mid-point between the "blended" rate established for the first period (1.5 billion transmissions) and that set for the second period. *See* Final Rule, 67 Fed. Reg. at 45,252-53, 45,255. Furthermore, in setting the rate at the mid-point of this "zone of reasonableness," the Librarian explained that "it makes more sense to use both values and take the average of the two" because, "[i]n this way, the final unitary rate captures the actual value of the performance made in the initial period . . . and the projected value of the transmissions at the agreed upon rates for the remainder of the license period; and it falls within the range of acknowledged values for these transmissions." *Id.* at 45,255.

Second, the Librarian explained that the CARP's decision to give any weight to eight of the 25 other RIAA benchmark agreements in setting the ephemeral recording rate was arbitrary. *See id.* at 45,262. Because the CARP had "previously repudiated" these agreements, the Librarian explained that, absent "a clear explanation," it was arbitrary for the CARP to use these agreements (which contained ephemeral recording rates "around" 10 percent of the performance royalties) to justify its decision to round the RIAA-Yahoo! 8.8 percent ephemeral recording rate up to 9 percent. *Id.* at 45,261-62. As the CARP did not clearly explain its about-face, the Librarian set the ephemeral recording rate at 8.8 percent. *See id.* at 45,262. This decision was not arbitrary because the rate was derived from the RIAA-Yahoo! agreement, and the CARP had previously determined that the other benchmark agreements containing higher rates were unreliable and did not reflect going market rates.

Third, the Librarian's "application of rounding" was not arbitrary. As explained above, the Librarian declined to increase the ephemeral recording rate to 9 percent, because the CARP did so based on agreements that it had found unreliable for establishing marketplace rates. *See id.* at 45,261-62; CARP Report at 60 ("The Panel concludes that the 25 non-Yahoo! license agreements . . . are unreliable benchmarks."). The Librarian also did not act in an arbitrary manner in setting the sound performance royalty rate at 0.07¢, rather than at 0.074¢. As noted above, the Librarian explained why he set the zone of reasonableness for the sound recording performance rate where he did, and he ultimately selected a rate that fell within that identified zone. We can require no more. *See NAB*, 147 F.3d at 918, 929 ("Our job, rather, is to determine whether the royalty awards are within a 'zone of reasonableness.'") (citation omitted).

3. Minimum fee

The Owners next challenge the Librarian's selection of a $500 minimum fee for eligible non-subscription services. They contend that, in accepting the CARP's determination, the Librarian arbitrarily failed to consider the full range of minimum fees established in the licenses RIAA negotiated in the marketplace, or base the annual minimum fee on the RIAA-Yahoo! agreement. Accordingly, the Owners ask the court to modify the Librarian's decision by increasing the annual minimum fee to $5,000. Because the Librarian did not act in an "arbitrary manner" in determining the fee, we have no power to modify it. *See* 17 U.S.C. § 802(g).

After examining the marketplace agreements offered by RIAA, the CARP set the minimum fee based on the "lowest value" that RIAA had accepted in one of its prior agreements. *See* Final Rule, 67 Fed. Reg. at 45,262-63. This choice was not arbitrary, as the Librarian explained, because it comported with the CARP's understanding of the fee's purpose: to cover the license administrator's administrative costs and the value of access to all of the sound recordings "up to the cost of the minimum fee." *Id.* at 45,262. As the Librarian observed, "RIAA would not have negotiated a minimum fee that failed to cover at least its administrative costs and the value of access to all the works up to the cost of the minimum fee." *Id.* The Librarian therefore concluded, as the CARP had itself concluded, that $500 was the appropriate minimum fee because, "[h]ad RIAA truly believed that the $500 minimum fee was inadequate to cover at least the administrative costs and the value of access, . . . it would have required a higher fee." *Id.* at 45,263. Accordingly, because the Librarian "plausibly explained" his decision to adopt the CARP's $500 minimum fee, and because that determination "bears a rational relationship to

the record evidence," *see NAB*, 146 F.3d at 924, he did not act in an "arbitrary manner" in setting a $500 minimum license fee. *See* 17 U.S.C. § 802(g).

    4.  Setting an effective date for the payment of royalty rates

Finally, the Owners raise two challenges to the effective date the Librarian set for the royalty rates, which, in turn, established the deadline for full payment of arrears. They initially maintain that, by setting an effective date different from the date of Federal Register publication, the Librarian violated the explicit dictates of the Copyright Act. As they see it, 17 U.S.C. § 114(f)(4)(C), which provides that "[a]ny royalty payments in arrears shall be made on or before the twentieth day of the month next succeeding the month in which the royalty fees are *set*"(emphasis added), must be read together with § 802(f), which states that "the Librarian shall . . . issue an order *setting* the royalty fee" (emphasis added), to mean that the Librarian "sets" the royalty rate on the date it is published by the Federal Register. Thus, in their view, by setting September 1, 2002 as the effective date instead July 8, 2002–and, consequently, requiring full payment of arrears on October 20, 2002 instead of August 20, 2002–the Librarian violated § 114(f)(4)(C)'s plain command. The Owners additionally maintain that, even if the Librarian is authorized by statute to delay the effective date of a royalty rate, his decision to do so here was nevertheless arbitrary, because it is not supported by any record evidence.

Before determining the merits of the Owners' contentions, we must first determine whether we have jurisdiction to do so. By constitutional design, a federal court is authorized only to adjudicate "actual, ongoing controversies," *Honig v. Doe*, 484 U.S. 305, 317 (1988), and thus may not "give opinions upon moot questions or abstract propositions, or . . . declare principles

or rules of law which cannot affect the matter in issue in the case before it." *Mills v. Green*, 159 U.S. 651, 653 (1895), *quoted in Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). Accordingly, if an event occurs while a case is pending on appeal that makes it impossible for the court to grant "any effectual relief whatever" to a prevailing party, the appeal must be dismissed. *See Mills*, 159 U.S. at 653; *accord, e.g.*, *McBryde v. Comm. to Review*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot."). As the Owners candidly admit, the Librarian's deadline for making payments in arrears, as well as the earlier one desired by the Owners, has long since passed. Because even the most favorable of rulings could not turn back the clock on either deadline we can offer the Owners no meaningful relief. The issue is thus moot and this Court is without authority to address it.

While acknowledging that the issue is ostensibly moot, the Owners maintain that the Court may nevertheless address it because it falls within the "capable of repetition yet evading review" exception to the mootness doctrine. *See Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). In order to invoke this exception, however, the Owners must demonstrate that "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam). While the Owners may satisfy the "evading review" element, they do not satisfy the "capable of repetition" one.

The Supreme Court and this Court have held that "orders of less than two years' duration ordinarily evade review." *Burlington N. R. Co. v. STB*, 75 F.3d 685, 690 (D.C. Cir. 1996);

*see Southern Pacific*, 219 U.S. at 514-16. Because the Librarian's deadline for full payment of arrears followed publication of the royalty rate in the Federal Register by only a few months, it was a virtual certainty that the deadline would pass before the Owners' challenge to it could be fully litigated and resolved by the court. *Cf. Burlington*, 75 F.3d at 690 ("The agency action here would also evade review, because of the virtual certainty that contracts giving rise to such action will expire before the conclusion of judicial review of the action . . . ."). The Owners therefore meet the first element of this exception to the mootness doctrine.

They fail, however, to satisfy their burden under the second half of the test. For an action to be "capable of repetition" there must be "a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein*, 423 U.S. at 149. Courts have "interpreted 'same action' to refer to particular agency policies, regulations, guidelines, or recurrent identical agency actions." *Public Utilities Comm'n of Cal. v. FERC*, 236 F.3d 708, 714-15 (D.C. Cir. 2001). In an effort to satisfy this element of the exception, the Owners offer that "royalty payments in arrears may be due for 2003-04, because certain statutory licensees take the position that rates are not yet in place. When rates are set, the Librarian might choose once again to delay the payment deadline." Owners' Br. at 30 n.16. Because the Librarian must initiate royalty rate adjustment proceedings at two-year intervals following January 2000, there is at least a theoretical possibility that, in a proceeding in which the Owners will almost certainly be involved, the Librarian will again set an effective date for the royalty rate that is later than the Federal Register publication date. *See* 17 U.S.C. §§ 112(e)(7) & 114(f)(2)(C)(i)(II). A "theoretical possibility," however, is not sufficient to qualify as "capable of repetition." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982); *accord Public Utilities Comm'n of Cal.*, 236 F.3d at 714. There must instead

be a "reasonable expectation" or "demonstrated probability" that the action will recur. *Murphy*, 455 U.S. at 482; *Public Utilities Comm'n of Cal.*, 236 F.3d at 714. Given that the Librarian's choice of the challenged effective date was apparently motivated by factors unique to this proceeding and unlikely to recur–i.e., the burden placed on licensees who must pay all royalties owed since October 1998 and the need for the Copyright Office to promulgate rules necessary for distributing royalty fees, *see* Final Rule, 67 Fed. Reg. at 45,271–the Owners have failed to demonstrate that there is any "reasonable expectation" that the Librarian will alter payment dates again. Thus this issue is moot. "[A]s a matter of course, [we] vacate[] agency orders in cases that have become moot by the time of judicial review." *American Family Life Assur. Co. v. FCC*, 129 F.3d 625, 630 (D.C. Cir. 1997), citing *A. L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 329 (1961).

5. Broadcasters' challenge to reliance on the RIAA-Yahoo! agreement

The Broadcasters claim that the Librarian acted arbitrarily by adopting the CARP's use of the RIAA-Yahoo! agreement because it was not comparable to market rates. The Librarian must establish "rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(2)(B). "In establishing such rates and terms, the [CARP] may consider the rates and terms for *comparable* types of digital audio transmission services and *comparable* circumstances under voluntary license agreements . . . ." 17 U.S.C. § 114(f)(2)(B)(ii) (emphasis added).

The Broadcasters argue the RIAA-Yahoo! agreement is not comparable because it was negotiated in a nascent market controlled by an allegedly monopolistic group that employed

market power to set fees it knew would be used as CARP evidence. Specifically, the Broadcasters claim that there was no direct evidence of a competitive market because the RIAA Negotiating Committee represented over 90% of all copyrighted sound recordings. Broadcasters point to the "cartel's" inability to conclude agreements with more than merely 26 of the hundreds of broadcasters in the marketplace, and its inability to reach agreement with any radio broadcaster, as evidence of its monopolistic power. Broadcasters' Br. at 21 (citing CARP Report at 50).

The Broadcasters' argument ultimately fails because it rests simply on a challenge to the *merits* of the Librarian's decision to rely on the RIAA-Yahoo! agreement as competitive. Again, we do not examine the correctness of the Librarian's decision regarding Yahoo!'s competitiveness or the weight the CARP afforded witnesses testifying about the RIAA-Yahoo! agreement, but question only whether the Librarian explained his decision on comparability in "facially plausible" terms according to record evidence. *See NAB*, 146 F.3d at 918. The Librarian discussed this issue at some length. *See* Final Rule, 67 Fed. Reg. at 45,246-56.

The Librarian noted that the RIAA-Yahoo! agreement merited significant weight because "(1) Yahoo! was a successful and sophisticated business which, to date, had made well over half of all DMCA-compliant performances; [and] (2) it had comparable resources and bargaining power to those RIAA brought to the table." *Id.* at 45,248. The Librarian did not merely parrot the CARP's conclusions, but criticized the weight it gave to the RIAA-Yahoo! agreement's rate distinction between webcasting and simulcasting. *Id.* He concluded that "the different rates do not actually represent the parties' understanding of the value of the performance right for these types of transmissions," but resulted from other interests of the

parties during negotiations. *Id.* at 45,248, 45,251. The Librarian also cited record facts supporting a finding that the Yahoo! agreement was statutorily comparable, noting RIAA's assertions that "many webcasters affirmatively stated that Yahoo! is a competitor" and that "the number of the performances made by Yahoo! on its Internet-only channels is roughly equivalent to the number of performances made by the other webcasters in this proceeding . . . ." *Id.* at 45,249. The Librarian's consideration of the record evidence and explanation of his reasoning are certainly "facially plausible" and sufficient to withstand our "exceptionally deferential" review. *NAB*, 146 F.3d at 918, 930.

6. Failure to include litigation costs in the valuation of the RIAA-Yahoo! agreement

The Broadcasters next argue the Librarian acted in an arbitrary manner by refusing to adjust the weight given to the RIAA-Yahoo! agreement to account for savings in litigation costs that Yahoo! achieved by negotiating its rate before the CARP convened.

The Broadcasters assert that the Librarian refused to make an adjustment to account for litigation cost savings while acknowledging that it would be appropriate. They cite Yahoo! testimony from the sealed record giving an estimate of costs the company saved by avoiding the CARP proceeding, maintaining that this savings put the effective rate of the RIAA-Yahoo! agreement well below the "zone of reasonableness" determined by the Librarian. This misstates the Librarian's position, which is that any adjustment from such savings is so uncertain that even without the adjustment the rate was likely already within the statutory zone of reasonableness. Specifically, the Librarian found that although "Webcasters had argued for a downward adjustment . . . to compensate for litigation cost savings" and "it is reasonable to assume that the rates in the Yahoo! agreement

are slightly higher" because of the litigation cost savings, "there is a problem in making an adjustment to the proposed rate where the record contains no information quantifying the added value of the factors that purportedly resulted in inflated rates." Final Rule, 67 Fed. Reg. at 45,255. He concluded that, "because the Register is recommending a rate in the middle of the 'zone of reasonableness,' it is safe to conclude that the recommended rate falls into that zone of reasonableness even taking these factors into account." *Id.*

The key question is not whether the Librarian's decision to refrain from adjusting for litigation costs was correct, but whether he based his decision not to adjust the rates on a "facially plausible" explanation of the record evidence. *See NAB*, 146 F.3d at 918. This question is a close one, because the Librarian devoted only the above-quoted sentences to the issue and did not discuss it at length. However, because of our extremely deferential review we find that the Librarian's explanation at least provides a "facially plausible" account of the reasons for his decision.

7. The use of different rates for Simulcasters and Webcasters

Broadcasters finally argue that the Librarian acted in an arbitrary manner by rejecting the portion of the CARP's decision that set different rates for Simulcasters and Webcasters. Broadcasters point to record evidence showing that Yahoo! did not believe it could pass on the rates it had negotiated to its simulcasters. Final Rule, 67 Fed. Reg. at 45,254. They also highlight that the CARP found "essentially undisputed testimony that traditional over-the-air radio play has a tremendous promotional impact on phonorecord sales." CARP Report at 74-75. On the basis of such record evidence, they claim that the Librarian was bound to accept the CARP's

recommendation to apply lower rates to Simulcasters than Webcasters, and that to reject the CARP's decision on this point was arbitrary.

These contentions fail because the Librarian adequately cites and explains record evidence to support his contrary decision. The Librarian rejected the CARP's reasoning, pointing out that "the Yahoo! agreement established rates for retransmissions of the same types of radio station signals as those directly streamed by commercial broadcasters" such that the "burden of proof" was put on the Broadcasters to "distinguish between the direct transmission of their programs over the Internet and the retransmission of the same programming made by a third-party." *Id.* at 45,254. Finding that they were "unable to offer any compelling evidence on this point," the Librarian concluded that the "Panel was unable to distinguish between commercial broadcasters and radio retransmissions," and therefore should have set the same rates for the two. *Id.* The Librarian plausibly reasoned that the rates should be the same, stating

> an examination of the record clearly shows that both [Simulcasters' and Webcasters'] business models are fundamentally comparable in at least one all-important way: they simulcast AM/FM programs over the Internet to anyone anywhere in the world who chooses to listen. Even accepting the fact that [Simulcasters] say their fundamental business is to provide programming to their local audiences, the potential for reaching a wider audience cannot be denied. Given that the record indicates that 70% of Yahoo!'s radio retransmissions are to listeners within 150 miles of the originating radio station's transmitter, Yahoo!'s business with respect to radio retransmissions seems to be very similar.

*Id.* Whether correct or not, the Librarian's decision to counter the CARP on this point is plausibly explained in terms of the record before him.

Broadcasters nonetheless further argue that the Librarian arbitrarily disregarded their contention that the RIAA-Yahoo! rates were not representative of market prices because Broadcasters "never would have agreed to the rates that Yahoo! paid because their purposes for streaming differ from Yahoo!'s purposes." *Id.* In support of this argument, Broadcasters similarly cite record testimony that "Yahoo! feared broadcasters [using its services] would be unwilling to absorb the rates Yahoo! negotiated for streaming AM/FM programming." *Id.* Contrary to the Broadcasters' assertions, the Librarian did not avoid grappling with this evidence, but plausibly explained that it was not persuasive because, since Yahoo! concluded no agreements with the Broadcasters on this point, "no determination could be made as to whether the broadcasters would have accepted the rate and paid it, or rejected it out of hand." *Id.* at 45,255. We do not examine the correctness of this contention, but simply affirm that the Librarian adequately explained his decision based on record evidence. He acted within his prerogative to find the RIAA's arguments more persuasive than the Broadcasters'. Thus, the Librarian did not act arbitrarily in accepting the Register's decision, in opposition to the CARP's, to set the same rate for Simulcasters and Webcasters.

### III. Conclusion

For the reasons given above we deny intervention to the Non-Participants, deny the petition for review, and vacate the Librarian's determination of the effective date for payment as moot.