# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 13, 2007        Decided August 14, 2007

No. 06-1283

KLEIMAN & HOCHBERG, INC., ET AL.,
PETITIONERS

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,
RESPONDENT

On Petition for Review of an Order of the
Department of Agriculture

*Mark C. H. Mandell* argued the cause and filed the briefs for petitioners.

*Leslie K. Lagomarcino*, Senior Counsel, U.S. Department of Agriculture, argued the cause for respondent. With her on the brief were *James Michael Kelly*, Deputy General Counsel, and *Margaret M. Breinholt*, Assistant General Counsel.

Before: TATEL, GARLAND, and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The petitioners in this case are Kleiman & Hochberg, Inc., a wholesale produce merchant, and

its president, Michael Hirsch. The company's vice president pled guilty to bribing a federal produce inspector and later admitted that he had been making similar payments for more than a decade. After an administrative enforcement proceeding, the Secretary of Agriculture revoked the company's license to do business under the Perishable Agricultural Commodities Act. The same administrative decision triggered restrictions on Hirsch's ability to work in the produce industry. The petitioners now seek review of that decision. For the reasons explained below, we deny the petition for review.

I

Kleiman & Hochberg, Inc. (K&H) is a New York corporation operated out of the Hunts Point Terminal Market in the Bronx, New York. Since 1947, K&H has maintained a license to buy and sell produce in interstate commerce under the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499a *et seq*. During the period of time relevant to this case, K&H had three principals: Michael Hirsch, its president; Barry Hirsch, its treasurer and Michael's brother; and John Thomas, its vice president. Each man owned 31.6 percent of the corporation's outstanding stock.

Our recent opinion in *Coosemans Specialties, Inc. v. Department of Agriculture*, 482 F.3d 560 (D.C. Cir. 2007), which involved the bribery of the same federal inspector by a different company, sets forth the relevant background information regarding Hunts Point:

> The perishable produce that arrives at Hunts Point often travels some distance between the supplier and a buyer, such as [K&H]. As a result, produce may arrive in a condition worse than expected. If the buyer then asks for a price reduction, the [supplier] is at a

disadvantage, because it has no way of knowing whether to trust the buyer's representations about the condition of the produce. The [United States Department of Agriculture's (USDA's)] inspection process is intended to level the playing field by providing the faraway [supplier] with an independent evaluation of the produce's condition so he can be assured that the price he receives is fair. A buyer, upon receipt of nonconforming goods, may request an inspection. [A USDA] inspector reviews the produce and issues an official certificate assessing its condition that can help the producer and buyer renegotiate the price. . . .

This inspection system has been subject to abuse. For two decades, corrupt USDA inspectors and buyers at Hunts Point participated in a scheme of illegal payments. An inspector who received a bribe might furnish a falsified certificate indicating that the produce's condition was worse than it actually was. The buyer would use that certificate to negotiate a lower price with the supplier. Once he paid the supplier, the buyer could resell the produce for a price that reflected the produce's actual condition. In this way, a buyer who bribed inspectors for this purpose could increase his profit margin to the detriment of the supplier. Additionally, some inspectors who had accepted bribes permitted those companies to jump to the front of the line for inspections, thereby delaying the inspections of their competitors. Produce being perishable, buyers who had to wait for inspections were likely to receive lower prices when the goods were eventually resold.

In 1999, one of the Hunts Point inspectors, William Cashin, was caught taking bribes. After his arrest, he agreed to cooperate with investigators. He conducted inspections from April until August 1999 while wearing audio and/or video recording devices to document the bribes he received.

*Coosemans Specialties*, 482 F.3d at 562-63. At the end of each day of work, Inspector Cashin met with agents of the FBI and the USDA's Office of Inspector General to turn over bribe money and describe the particulars of the bribes he received that day.

Cashin later testified that he received bribes from K&H Vice President John Thomas in conjunction with K&H produce transactions on twelve separate occasions. In October 1999, a grand jury indicted Thomas on seven counts of bribing a public official, in violation of 18 U.S.C. § 201(b)(1)(A). A year later, Thomas pled guilty to a one-count information stating that he "made cash payments to [USDA] produce inspectors in order to obtain expedited inspections." J.A. 664.

On July 17, 2002, the USDA's Agricultural Marketing Service filed an administrative complaint charging K&H with violating PACA by bribing a produce inspector. On February 12, 2003, the Service determined that both Michael and Barry Hirsch were "responsibly connected" to K&H within the meaning of PACA. (The significance of this determination is discussed in Part II.) The Hirsches then filed petitions for review of the "responsibly connected" determinations, and an administrative law judge (ALJ) consolidated those proceedings with the ongoing disciplinary proceeding against the company.

In 2004, the ALJ conducted an eight-day hearing. Cashin testified that, beginning in the late 1980s or early 1990s, Thomas

paid him a fifty-dollar bribe for each inspection. In return, Cashin said he "help[ed]" K&H by altering some aspects of its inspection certificates, J.A. 29, although he could not recall precisely how he changed the certificates.

When Thomas testified, he admitted paying bribes to USDA produce inspectors. He said that he began this practice in the "mid or late[] '80s," when he was visited by a produce inspector named Danny Arcery. J.A. 196. Thomas said that Arcery visited him after Thomas lodged several complaints with the USDA about late inspections. According to Thomas, Arcery told him:

> In order to avoid late inspections, here's what has to be done, you will give a tip of $25.00 to an inspector to come quicker rather than purposely later. . . . If you follow these instructions, everything will be okay. No more calls. No more calls. Don't call Washington. We've got people down there.

J.A. 197-98.[1] Thomas testified that Arcery also told him that, if he did not make the payments, "[then] don't hold your breath for an inspection . . . the shit will rot in the box until somebody comes." J.A. 198. Thomas explained that the purpose of the bribes was always "to get a quicker inspection," and he denied ever asking Cashin or any other produce inspector to falsify an inspection report. J.A. 205. He testified that no one else at K&H, including the Hirsches, knew that he was bribing produce inspectors throughout the 1980s and 1990s. When asked why he never reported the corrupt inspectors to the authorities, Thomas testified that he "was afraid." J.A. 220. But when asked what

---

[1]Thomas testified that the amount of the bribes increased to fifty dollars per inspection in the 1990s.

he was afraid Arcery would do, Thomas replied, "I had no idea." J.A. 220.

The ALJ issued his decision and order on December 3, 2004. *See Kleiman & Hochberg, Inc.*, PACA Docket Nos. D-02-0021, APP-03-0005, APP-03-0006 (U.S.D.A. Dec. 3, 2004). He found that there was "undisputed evidence that Thomas bribed Cashin in connection with" twelve separate produce inspections. *Id.* at 9. The ALJ concluded that K&H had violated PACA and that the Hirsches were responsibly connected to the company. *Id.* at 18-19. After considering the circumstances of the case, however, he declined to revoke K&H's license, and instead assessed a penalty of $180,000. *Id.* at 33.

All of the parties appealed to the USDA's Judicial Officer, to whom the Secretary has delegated authority for final decisionmaking in adjudicatory proceedings. *See* 7 C.F.R. § 2.35(a). The Judicial Officer issued his decision and order on April 5, 2006. *See Kleiman & Hochberg, Inc.*, PACA Docket Nos. D-02-0021, APP-03-0005, APP-03-0006 (U.S.D.A. Apr. 5, 2006) (Judicial Officer Decision). He disagreed with the ALJ in only one respect, concluding that the appropriate sanction was revocation of K&H's PACA license. *Id.* at 31-35.

After the Judicial Officer denied their petition for reconsideration, K&H and Michael Hirsch petitioned for review in this court pursuant to 28 U.S.C. § 2342(2). Barry Hirsch also petitioned, but he died on April 10, 2007, and thereafter the petition was dismissed as to him. The Judicial Officer has stayed his orders pending the outcome of our review.

The petitioners raise a series of challenges to the Judicial Officer's decision. In Part II, we review the regulatory regime

established by PACA and explain how it was applied in this case. In Part III, we consider the petitioners' challenges.

II

Congress enacted PACA "to facilitate interstate commerce in fresh fruits and vegetables. To help instill confidence in parties dealing with each other on short notice, across state lines and at long distances, it provides special sanctions against dishonest or unreliable dealing." *Veg-Mix, Inc. v. USDA*, 832 F.2d 601, 604 (D.C. Cir. 1987) (citation omitted). Because the "industry [was] thought to be unusually prone to fraud and to unfair practices," *Tri-County Wholesale Produce Co. v. USDA*, 822 F.2d 162, 163 (D.C. Cir. 1987), PACA erected a strict regulatory regime. The Act requires persons who buy or sell specified quantities of perishable agricultural commodities at wholesale in interstate commerce to have a license issued by the Secretary of Agriculture, *see* 7 U.S.C. §§ 499a(b)(5)-(7), 499c(a), and makes it unlawful for a licensee to engage in certain types of unfair conduct, *see id.* § 499b. The relevant prohibition in this case, § 499b(4), makes it unlawful for a licensee to "fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with" any transaction in interstate or foreign commerce involving a perishable agricultural commodity. *Id.* § 499b(4). PACA also includes a respondeat superior provision, which deems the acts of a licensee's agents that fall within the scope of their employment to be the acts of the licensee. *Id.* § 499p.

If the Secretary of Agriculture determines that a PACA licensee has violated § 499b(4), the Secretary is authorized to impose a range of sanctions. *See id.* § 499h. "[I]f the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender." *Id.* § 499h(a). A license revocation can

have serious repercussions for individuals who are associated with the licensee. When an entity's PACA license is revoked, the Act prohibits any person who was "responsibly connected" to the entity from working for any other licensee for at least one year. *Id.* § 499h(b).

Prior to 1995, PACA defined "responsibly connected" as (inter alia) "affiliated or connected with a commission merchant, dealer, or broker as . . . [an] officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association." 7 U.S.C. § 499a(b)(9) (1994). Congress amended that definition in 1995. *See* 7 U.S.C. § 499a(b)(9). Under the amended statute, the Secretary "must first determine if an individual" is an officer, director, or holder of more than ten percent of the violating licensee's stock. *Norinsberg v. USDA*, 162 F.3d 1194, 1197 (D.C. Cir. 1998). "If so, the burden shifts to the individual to demonstrate that he was not actively involved [in the violation] and that he was either only a nominal officer or not an owner of a licensee within the meaning of the statute." *Id.*; *see infra* Part III.E.

The Judicial Officer applied the foregoing provisions of PACA as follows. First, he concluded that Thomas' payment of bribes to USDA produce inspectors breached an implied duty and thereby violated § 499b(4). Next, he determined that those violations should be imputed to K&H under § 499p. He further concluded that the violations were willful, flagrant, and repeated, and imposed the maximum sanction of license revocation, as authorized by § 499h(a). Finally, he determined that Michael Hirsch was "responsibly connected" to K&H under § 499a(b)(9), a finding that triggered PACA's employment restrictions. The petitioners challenge all of these conclusions.

III

"We review final decisions in PACA cases under the deferential standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (E). Under that standard, we must 'uphold the Judicial Officer's decision unless we find it to be arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence.'" *Kirby Produce Co. v. USDA*, 256 F.3d 830, 833 (D.C. Cir. 2001) (quoting *JSG Trading Corp. v. USDA*, 176 F.3d 536, 541 (D.C. Cir. 1999) ("*JSG Trading I*")). As we read their briefs, the petitioners challenge five aspects of the Judicial Officer's decision: (1) the determination that Thomas' payment of bribes to produce inspectors violated the "implied duty" clause of § 499b(4); (2) the treatment of Thomas' actions as the actions of K&H under § 499p; (3) the decision to revoke K&H's license under § 499h(a), rather than to impose a lesser sanction; (4) the Secretary's failure to provide petitioners with notice and an opportunity to halt Thomas' unlawful conduct before revoking K&H's license; and (5) the determination that Michael Hirsch was "responsibly connected" to K&H under § 499a(b)(9). We consider each objection in turn.

A

We begin with the petitioners' challenge to the Judicial Officer's determination that Thomas' bribes violated 7 U.S.C. § 499b(4), which makes it unlawful to "fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with" a produce transaction. 7 U.S.C. § 499b(4). The Judicial Officer's application of this section proceeded in two stages. First, he held that Thomas failed to perform an implied "duty to refrain from making payments to [USDA] produce inspectors in connection with the inspection of perishable agricultural

commodities." Judicial Officer Decision at 27. Second, he held that Thomas did not have "reasonable cause" for failing to perform the duty. *See id.* at 44-46.

At oral argument before this court, the petitioners did not dispute the Judicial Officer's interpretation of § 499b(4) as encompassing a duty to refrain from bribing government produce inspectors. *See* Oral Arg. Recording at 3:15. This turned out to be a prescient allocation of their legal ammunition, because another panel subsequently affirmed an identical interpretation of § 499b(4). In *Coosemans Specialties*, the court explained that the USDA's interpretation of PACA is entitled to deference under the two-step framework of *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984). *Coosemans Specialties*, 482 F.3d at 564; *see also Norinsberg*, 162 F.3d at 1199. Under that framework, if "the intent of Congress is clear, . . . [a court] must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. But "if the statute is silent or ambiguous with respect to the specific issue," the court must uphold the agency's interpretation as long as it is reasonable. *Id.* at 843. Applying that framework, *Coosemans Specialties* concluded that the implied duty clause is ambiguous, and that the Judicial Officer's view that it "includes a duty not to bribe USDA inspectors . . . is reasonable," because "[i]t is consistent with the purposes of the Act . . . to protect producers and other merchants from dishonest and irresponsible conduct." 482 F.3d at 565-66.[2]

---

[2]As we noted in *Coosemans Specialties*, we had previously "upheld the Secretary's construction of the implied duty clause as including a prohibition on commercial bribery," that is, the payment of bribes by a seller to a buyer's employee, without the knowledge of the employer. 482 F.3d at 565 (citing, inter alia, *JSG Trading Corp. v. Dep't of Agric.*, 235 F.3d 608, 610-11 (D.C. Cir. 2001) ("*JSG Trading II*"); *JSG Trading I*, 176 F.3d at 543).

The Second Circuit reached the same result in *G&T Terminal Packaging Co. v. USDA*, 468 F.3d 86 (2d Cir. 2006), another case arising out of the corruption at Hunts Point. After finding the "implied duty" language of § 499b(4) to be ambiguous, it "affirm[ed] as reasonable the Secretary's conclusion that the PACA imposes an implied duty upon licensees to refrain from making payments to USDA inspectors in connection with produce inspections, irrespective of whether those payments induce, or are intended to induce, the inspectors to issue inaccurate inspection certificates." *Id.* at 96. "Indeed," the court said, given PACA's statutory scheme, "which assigns government inspectors to protect the financial interests of distant shippers by providing impartial assessments of the condition of the produce upon arrival, we can hardly conceive of a duty more clearly implicated than the obligation of recipients not to make side-payments to these inspectors." *Id.* at 96-97 (citations omitted). We agree.

Rather than attack the Judicial Officer's construction of "implied duty," K&H and Hirsch direct their fire at the second part of the Officer's analysis: his rejection of their argument that Thomas had "reasonable cause" for bribing Cashin because he was the victim of "extortion." The Judicial Officer rejected that argument for two reasons. He concluded that: (1) Thomas was *not* the victim of "extortion," Judicial Officer Decision at 45, and (2) even if he was, "[t]he extortion cited by [petitioners] is not a 'reasonable cause' under . . . PACA," *id.* at 46 (citation omitted). We affirm both determinations.

The Judicial Officer's rejection of the petitioners' claim that Thomas' payments were the result of extortion is reasonable. There is no evidence in the record that Cashin made threats of any kind to induce Thomas to make the payments. Rather, the only evidence that anyone ever threatened Thomas is Thomas' testimony (recounted above) that a different produce inspector,

Arcery, did so a full decade prior to the bribes at issue here. According to Thomas, Arcery told him in the mid- to late-1980s that unless he paid bribes, K&H's produce would "rot in the box until somebody comes," and warned him that he should not "call Washington" because "[w]e've got people down there." J.A. 198. These statements do not compel a conclusion that Thomas' payments to Cashin a decade later were involuntary.

The Judicial Officer was also justified in concluding that, even if Thomas' payments were induced by extortion, the type of "extortion cited by [the petitioners] is not a 'reasonable cause' under [PACA] for [K&H]'s failure to perform the implied duty to refrain from [bribing] produce inspectors." Judicial Officer Decision at 46. First, under *Chevron* step one, PACA is ambiguous as to whether extortion provides "reasonable cause" for bribery. *See G&T Terminal*, 468 F.3d at 98. It could hardly be otherwise, as there is nothing in the statute that defines "reasonable cause" or mentions extortion or bribery. The petitioners do not argue to the contrary.

Moving to *Chevron* step two, we find that the Judicial Officer's interpretation of the "reasonable cause" provision is reasonable. Like the Second Circuit, "[w]e may presume that there are species of coercion so extreme that they rob an individual of any meaningful opportunity to resist." *Id.* But there was no such coercion in this case. The "threats" Arcery allegedly made to Thomas were in any event "'soft' enough to support the view that no reasonable cause existed for the petitioners' breach of duty." *Id.*; *see also id.* (noting that the inspectors at Hunts Point did not "physically threaten[]" the bribe payer and did not threaten "the loss or destruction of his business, harm to his family or employees, blackmail, or the outright denial of produce inspections"). Like the bribe payer in *G&T Terminal*, Thomas had "choices about how to respond to

[the inspector's] demands for illegal payments -- hard choices, perhaps, but meaningful ones all the same." *Id.* at 99.

In sum, we affirm the Judicial Officer's reasonable determination that Thomas violated § 499b(4): his conduct breached the implied duty not to bribe USDA inspectors, and he had no "reasonable cause" for so doing.

B

The petitioners next challenge the Judicial Officer's determination that Thomas' actions should be deemed the actions of K&H under 7 U.S.C. § 499p, PACA's respondeat superior provision. Section 499p provides that "the act, omission, or failure of any agent, officer, or other person acting for or employed by any [licensee], within the scope of his employment or office, shall in every case be deemed the act, omission, or failure of such [licensee]." 7 U.S.C. § 499p. In applying this provision, the Judicial Officer found that "Thomas paid bribes to [USDA] produce inspectors at [K&H's] place of business, during regular working hours, and in connection with the inspection of perishable agricultural commodities purchased, received, and accepted by [K&H]." Judicial Officer Decision at 48. Further, "Thomas was authorized to apply for" produce inspections by K&H, and the bribes he paid "were intended to benefit" the company. *Id.* at 48-49. The Officer concluded that "[t]he record clearly establishes that John Thomas was [acting] within the scope of his employment" when he bribed Cashin. *Id.* at 48. Accordingly, under § 499p, "the knowing and willful bribes by John Thomas are deemed to be knowing and willful bribes by" K&H. *Id.* at 25.

We find no fault in the Judicial Officer's application of § 499p. In a similar case, we upheld the Secretary's determination that an employee's payment of bribes to a USDA inspector for

the benefit of his company fell within the scope of his employment. *See Post & Taback, Inc. v. Dep't of Agric.*, 123 F. App'x 406, 408 (D.C. Cir. 2005). Other courts have reached the same result. *See, e.g.*, *Koam Produce, Inc. v. DiMare Homestead, Inc.*, 329 F.3d 123, 130 (2d Cir. 2003). Indeed, at oral argument, counsel for the petitioners conceded that an officer of a company generally acts "within the scope of his employment" when he pays a bribe to a produce inspector. Oral Arg. Recording at 7:44.

The petitioners offer two reasons why § 499p is nonetheless inapplicable to this case. First, they contend that Thomas' actions were "secret" and "undiscoverable," Pet'rs Br. 35, and that, as a consequence, K&H "had absolutely no . . . ability to control what Thomas did with the inspectors," *id.* at 34. As the government correctly notes, this rhetoric overstates the situation. Thomas was not, as the petitioners suggest, some third-party actor beyond the company's control; to the contrary, he was the company's one-third owner and treasurer and had worked for the company for thirty years. More important, the petitioners' argument contradicts the express language of the statute. Section 499p provides that the act of an officer, within the scope of his employment, "shall *in every case* be deemed the act" of the licensee. 7 U.S.C. § 499p (emphasis added). As we held in *Post & Taback*, "the plain language of the [section] provides no escape hatch for merchants who allege ignorance of their employees' misconduct." 123 F. App'x at 408 (internal quotation marks and ellipsis omitted).

Second, the petitioners argue that Thomas' bribes did not have "any connection with or impact on the actual produce transactions between Petitioners and their shippers and suppliers," and did not cause any "damage." Pet'rs Br. 33. This second argument has the same flaws as the first. It is factually incorrect because, as we noted in *Coosemans Specialties*,

companies that paid bribes to expedite their inspections at Hunts Point "jump[ed] to the front of the line for inspections, thereby delaying the inspections of their competitors." 482 F.3d at 563; *see id.* at 567 (noting that this "conduct not only gave [the company] a competitive advantage, but it also increased the pressure on other merchants to engage in bribery to remain competitive"); *see also* Judicial Officer Decision at 20 (finding that Thomas pled guilty to making "cash payments to [USDA] produce inspectors in order to obtain expedited inspections"). Moreover, and again more important, the statute requires imputation of wrongful conduct to the licensee "in every case," 7 U.S.C. § 499p -- not simply in those cases in which damage was done.

Finally, the petitioners contend that, if § 499p is interpreted according to its express terms, it amounts to "an unconstitutional irrebuttable presumption" because it "provide[s] that certain facts (Thomas' admitted payments) shall be conclusive evidence of guilt of Petitioners," thereby depriving them of "the right to engage in . . . one of the common occupations of life." Pet'rs Br. 35-36. In fact, § 499p simply makes applicable to wholesale produce merchants the principle of respondeat superior, a substantive legal doctrine widely accepted at common law[3] and widely incorporated into federal regulatory statutes.[4] Whether

---

[3]*See* Oliver W. Holmes, Jr., *Agency*, 4 HARV. L. REV. 345, 356 (1891).

[4]*See, e.g.*, 7 U.S.C. § 63 (cotton standards); *id.* § 87d (grain standards); *id.* § 223 (packers and stockyards); *id.* § 511*l* (tobacco inspection); *id.* § 2139 (transportation of animals); *id.* § 8313(c) (animal health protection); 15 U.S.C. § 431(f) (discrimination against farmers' cooperative associations by boards of trade); 21 U.S.C. § 63 (filled milk); *id.* § 461(a) (poultry and poultry products inspection); *id.* § 1041(d) (egg products inspection); 47 U.S.C. § 217 (regulation of common carriers in wire or radio communication).

or not we call that doctrine an "irrebuttable presumption,"[5] if applying it "does not abridge a fundamental right or discriminate against a suspect class, it [must be] upheld if it 'bears a rational relation to a legitimate legislative goal.'" *Delong v. Dep't of Health & Human Servs.*, 264 F.3d 1334, 1341 (Fed. Cir. 2001) (brackets and ellipsis omitted) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 772 (1975)); *see Hawkins v. Agric. Mktg. Serv.*, 10 F.3d 1125, 1133 (5th Cir. 1993); *see generally Edison Elec. Inst. v. EPA*, 391 F.3d 1267, 1272 n.5 (D.C. Cir. 2004); sources cited *supra* note 5.

The petitioners do not claim that there is a fundamental right or suspect class at issue here, and there is no doubt that § 499p bears a rational relation to a legitimate legislative goal. By imposing liability on licensees whose agents violate PACA, the respondeat superior doctrine encourages produce companies to "use [their] control over the employee to prevent" violations of the Act. *Sullivan v. Freeman*, 944 F.2d 334, 336 (7th Cir. 1991) (discussing the role of the doctrine in general). "While admittedly the result Congress desired could be harsh in some cases, we cannot say that [the statute] is not reasonably designed to achieve the desired Congressional purpose." *Zwick v. Freeman*, 373 F.2d 110, 118 (2d Cir. 1967) (specifically referring to § 499h(b), which restricts the employment of "responsibly connected" persons).

---

[5]Commentators have noted that the Supreme Court "has not applied the irrebuttable presumption doctrine" since the early 1970s. ERWIN CHEMERINSKY, CONSTITUTIONAL LAW § 9.4 n.65 (3d ed. 2006); *see* GERALD GUNTHER & KATHLEEN M. SULLIVAN, CONSTITUTIONAL LAW 915 (13th ed. 1997) (stating that the irrebuttable presumption doctrine was "abandoned by the Court" in *Weinberger v. Salfi*, 422 U.S. 749 (1975)); *see generally* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1621-24 (2d ed. 1988).

The petitioners disparage the Judicial Officer's attribution of Thomas' misconduct to the company as a "rote application" of § 499p. Pet'rs Br. 32. In our view, this is just another way of saying that the Officer was faithful to the statutory text. And that is his -- and our -- responsibility.

C

Third, the petitioners argue that the Judicial Officer's decision to revoke K&H's PACA license is "unsupported by the great weight of the evidence and is arbitrary and capricious." Pet'rs Br. 44. As we have repeatedly noted, "'[w]e will not lightly disturb the [USDA's] choice of a remedy under a statute committed to its enforcement, especially given the Department's superior knowledge of the industry PACA regulates.'" *Coosemans Specialties*, 482 F.3d at 566-67 (quoting *JSG Trading II*, 235 F.3d at 617).

If a licensee's violation of PACA § 499b "is flagrant or repeated, the Secretary may, by order, revoke the license of the offender." 7 U.S.C. § 499h(a). The Judicial Officer found that K&H's violations of § 499b(4) were both flagrant *and* repeated, *see* Judicial Officer Decision at 30-31, and the petitioners do not challenge those findings. The Officer was therefore authorized to revoke K&H's license, and his decision to do so was fully consistent with precedent. In numerous cases arising out of the government's investigation at Hunts Point, revocation was the sanction imposed for bribing produce inspectors. *See, e.g.*, *Coosemans Specialties, Inc.*, PACA Docket No. D-02-0024 (U.S.D.A. Apr. 20, 2006); *In re M. Trombetta & Sons, Inc.*, PACA Docket No. D-02-0025 (U.S.D.A. Sept. 27, 2005); *G&T Terminal Packaging Co.*, PACA Docket No. D-03-0026 (U.S.D.A. Sept. 8, 2005).

The Judicial Officer was not required, of course, to impose the sanction of revocation and could have opted for a lesser punishment.  He chose not to do so because of the "egregious" nature of the bribes.  Judicial Officer Decision at 34.  The petitioners protest that Thomas' conduct was not egregious, because his bribes "had no effect on K&H's dealings with its suppliers."  Pet'rs Br. 45.  But the Judicial Officer relied on the testimony of John Koller, an official at the USDA's Agricultural Marketing Service, who testified that bribery of produce inspectors undermines the credibility of the entire PACA inspection process and increases the likelihood that other produce wholesalers will engage in similar illicit conduct.  Judicial Officer Decision at 33.[6]  License revocation was necessary, Koller said, in order to "deter other members of the industry from . . . making bribery payments."  *Id.*  Under these circumstances, we have no ground for finding the Judicial Officer's choice of sanctions unreasonable.  *See also Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 188-89 (1973) ("The fashioning of an appropriate and reasonable remedy is for the Secretary, not the court.").

D

The petitioners' fourth argument is that the Secretary violated the Administrative Procedure Act (APA) by instituting proceedings to revoke K&H's license without first providing the company with notice of Thomas' unlawful conduct and an opportunity to curb it.  Once again, the plain text of the statute bars the petitioners' argument.  The relevant section of the APA

---

[6]*See also Post & Taback*, *Inc.*, 62 Agric. Dec. 802, 825 (2003) ("[U]nlawful gratuities and bribes paid to [USDA] inspectors threaten the integrity of the entire inspection system and undermine the produce industry's trust in the entire inspection system."), *petition for review denied*, 123 F. App'x 406 (D.C. Cir. 2005).

states:  "*Except in cases of willfulness*[,] . . . revocation . . . of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given -- (1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements."  5 U.S.C. § 558(c) (emphasis added).  Here, the Judicial Officer found that K&H's violations of PACA were willful, *see* Judicial Officer Decision at 28-31 & n.8, thus bringing the case within the exception to the APA's notice requirement.

In applying § 558(c) to PACA violations, we have held that "'an action is willful if a prohibited act is done intentionally, irrespective of evil intent, or done with careless disregard of statutory requirements.'"  *Coosemans Specialties*, 482 F.3d at 567 (quoting *Finer Foods Sales Co. v. Block*, 708 F.2d 774, 778 (D.C. Cir. 1983)).  Applying this standard, the Judicial Officer found that Thomas, and therefore K&H, had willfully violated PACA by paying unlawful bribes to Cashin.  This finding is supported by substantial evidence.  Thomas pled guilty to an information stating that he "unlawfully, wilfully, knowingly, directly and indirectly, did corruptly give, offer and promise things of value to public officials."  J.A. 664.  And Thomas' own description of his bribes during his testimony before the ALJ shows that his conduct was intentional.  *See* J.A. 201-06.  On virtually identical evidence, *Coosemans Specialties* held that a PACA violation was willful and hence that the APA's notice provision was inapplicable.  482 F.3d at 567-68.  We do so here as well.  Indeed, we could not do otherwise without requiring the USDA to disclose an undercover law enforcement operation as soon as it detects a criminal violation.[7]

---

[7]Petitioners also suggest, obliquely, that Michael Hirsch was individually entitled to notice under APA § 558(c).  *See* Pet'rs Br. 25. Section 558(c), however, applies only to "licensees."  It does not

E

Finally, petitioner Michael Hirsch challenges the Judicial Officer's determination that he was "responsibly connected" to K&H during the period in which the company violated PACA. Section 499h(b) provides that "any person who is or has been responsibly connected with any [entity] whose license has been revoked" may not be employed by any other PACA licensee for at least one year. 7 U.S.C. § 499h(b). Because the Judicial Officer revoked K&H's license, the determination that Hirsch was responsibly connected to K&H makes him subject to this restriction.

PACA defines a "responsibly connected" person as one who is "affiliated or connected with a [licensee] as . . . [an] officer, director, or holder of more than 10 per centum of the outstanding stock." *Id.* § 499a(b)(9). There is no dispute that Hirsch -- who was all three -- comes within this definition. As noted above, however, a 1995 amendment qualified the definition. It provided:

> A person shall not be deemed to be responsibly connected if the person demonstrates by a preponderance of the evidence that the person was not actively involved in the activities resulting in a violation of [PACA] and that the person either was only nominally . . . [an] officer, director, or shareholder of a violating licensee . . . or was not an owner of a violating licensee . . . which was the alter ego of its owners.

require notice to the directors, officers, or owners of a licensee who are not themselves licensed. In this case, K&H was the only party that maintained a license, *see* J.A. 655-62, and that license is the only one at issue in these proceedings.

*Id.* Under the amended statute, the Secretary "must first determine if an individual" is an officer, director, or holder of more than ten percent of the violating licensee's stock. *Norinsberg*, 162 F.3d at 1197. "If so, the burden shifts to the individual to demonstrate [by a preponderance of the evidence] that he was not actively involved [in the violation] *and* that he was either only a nominal officer or not an owner of a licensee within the meaning of the statute." *Id.* (emphasis added). Hirsch did demonstrate that he was not actively involved in Thomas' bribery, *see* Judicial Officer Decision at 37, thus rendering this exception potentially available. However, because he makes no claim that he was "not an owner of a violating licensee . . . which was the alter ego of its owners,"[8] he must prove that he was "only nominally . . . [an] officer, director [and] shareholder" of K&H to obtain the exception's benefit.

Hirsch did not prove that he qualified for the "nominal" exception, nor could he do so. As Hirsch concedes, he owned 31.6 percent of the corporation's outstanding stock, was the company's President, and was "actively engaged in the day-to-day operations, management, *and control* of K&H." Pet'rs Br. 25 (emphasis added).

Nonetheless, Hirsch again notes that Thomas' bribes were undisclosed, and insists that a person cannot be responsibly connected to a violating licensee unless he "either knew or should have known about the violations and then failed to take

---

[8]"[T]he 'alter ego' exception applie[s] to 'cases in which the violator, although formally a corporation, is essentially an alter ego of its owners, so dominated as to negate its separate personality.' A petitioner who [is] not a true owner of such a corporation [will] be spared the consequences of the responsibly connected determination." *Coosemans Specialties*, 482 F.3d at 568 (quoting *Norinsberg*, 162 F.3d at 1197).

action to counteract the actions of others constituting the violations." *Id.* at 27. But neither the statutory definition of "responsibly connected" (an "officer, director, or holder of more than 10 per centum of the outstanding stock," 7 U.S.C. § 499a(b)(9)), nor the statutory "nominal" and "alter ego" exceptions suggest such a knowledge requirement. And "the inclusion of a specific exception for persons who make a certain showing . . . militate[s] against judicially created exceptions." *Coosemans Specialties*, 482 F.3d at 569.[9]

## IV

PACA "is admittedly and intentionally a tough law." S. REP. NO. 84-2507, at 3 (1956) (internal quotation marks omitted). In this case, the USDA's Judicial Officer chose the toughest possible sanction, notwithstanding the active involvement of the USDA's own inspectors in the widespread corruption at Hunts Point. *See Coosemans Specialties*, 482 F.3d at 567. But whether or not we would have levied the same penalty, we cannot say that the Officer's decision in that regard

---

[9]As they did with respect to PACA's respondeat superior provision, *see supra* Part III.B, the petitioners suggest that literal enforcement of the "responsibly connected" provision violates Hirsch's due process rights. We rejected this argument in *Siegel v. Lyng*, 851 F.2d 412, 416 n.12 (D.C. Cir. 1988), as have the other circuits that have considered it, *see Hawkins v. Agric. Mktg. Serv.*, 10 F.3d 1125, 1134 (5th Cir. 1993) ("We . . . cannot say that the unambiguous language of § 499a(b)(9) . . . was irrationally conceived or arbitrary in effecting a legitimate governmental objective, i.e., the protection of producers of perishable agricultural products."); *Zwick*, 373 F.2d at 118-19; *Birkenfield v. United States*, 369 F.2d 491, 494-95 (3d Cir. 1966).

-- or any other regard -- is arbitrary or unreasonable. Accordingly, the petition for review is

*Denied.*